UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ALYOSHA S. TUNKLE, M.D.,

    Plaintiff,

v.                                                     Case No.: 2:23-cv-10-SPC-NPM

RELIASTAR LIFE INSURANCE
COMPANY,

    Defendant.
_____/

# OPINION AND ORDER

Plaintiff Alyosha S. Tunkle, M.D. brought this action under the Employee Retirement Income Security Act ("ERISA") for review of Defendant ReliaStar Life Insurance Company's denial of his long-term disability claim. (Doc. 1). Before the Court are the parties' cross-motions for summary judgment. (Docs. 63, 67). Each party has responded to the other's motion (Docs. 68, 69),[1] and Defendant replied (Doc. 70). For the below reasons, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion.

---

[1] In Plaintiff's response, he incorporated by reference the arguments he raised in his summary-judgment motion. (Doc. 68 at 19). This is improper. Indeed, since the response was filed, this District amended its local rules to forbid such tactics. See M.D. Fla. R. 3.01(f).

## BACKGROUND

Plaintiff began working for 21st Century Oncology[2] as a general surgeon in 2010. (Doc. 56-1 at 481). On January 1, 2020, Defendant issued a group insurance policy to 21st Century for benefits to its employees. (Doc. 56-1 at 741). To qualify for coverage under the Policy, the insured employee must be in "active employment," meaning the insured works at least thirty hours per week. (Doc. 57-1 at 1, 4). Coverage under the Policy ends on the "last day [the insured is] in active employment except as provided under a covered leave of absence." (Doc. 57-1 at 9). Plaintiff was enrolled for coverage under the Policy.

In January 2020, Plaintiff suffered a left shoulder injury, which required joint-reconstructive surgery. (Doc. 56-1 at 423). He underwent the procedure that same month with Dr. Michael Havig. (Doc. 56-1 at 386-87). Post-operation, Dr. Havig instructed Plaintiff to wear a sling for six weeks. (Doc. 56-1 at 387). Nevertheless, Plaintiff returned to work the next day and continued performing surgeries less than a week later. (Doc. 56-1 at 135). Indeed, during each biweekly pay period from January 5 to March 14, 2020,

---

[2] 21st Century has since been acquired by GenesisCare USA, Inc. Through this acquisition, GenesisCare assumed the Policy. For consistency purposes, the Court will continue to refer to Plaintiff's employer as 21st Century.

Plaintiff logged eighty hours, or forty hours per week. (Doc. 56-1 at 551-59). Thus, he was actively employed.

In March, things began to change. For the next four pay periods—March 15th to May 23rd—Plaintiff recorded only 9.5 hours, roughly 4.75 hours a week. (Doc. 56-1 at 544-50). This, of course, falls well below the required thirty hours for active-employment status. During this timeframe, on May 14, 2020, Plaintiff consulted Dr. Havig with complaints of a tremor in his left arm, which made performing surgery difficult. (Doc. 56-1 at 430). Dr. Havig confirmed that Plaintiff "has a noticeable tremor in his hand," adding that he would refer Plaintiff to a neurologist if the symptoms worsened. (Doc. 56-1 at 432). Subsequently, on June 3, 2020, Plaintiff treated with neurologist Dr. Michael Vickers for the same tremors.

Nevertheless, Plaintiff resumed full-time work. During the four pay periods from May 24th to July 18th, he logged either seventy-two or eighty hours. (Doc. 56-1 at 535-43). But on July 30th, Dr. Vickers placed Plaintiff out of work, explaining that "[g]iven Dr. Tunkle's profession as a [] surgeon and given the level of tremor . . . continuing to operate presently is not an option and is not going to be an option going forward." (Doc. 56-1 at 167). More than three months later, Plaintiff submitted a claim for long-term disability benefits under the Policy. (Doc. 56-1 at 1, 703).

As part of its investigation into the claim, Defendant reviewed Plaintiff's employment records, which it obtained from 21st Century. It observed the reduction in Plaintiff's hours from March 15th to May 23rd. Because his hours during this period fell below the thirty-hour threshold to qualify for coverage, Defendant sought clarification from 21st Century as to the reason for this significant decrease. (Doc. 56-1 at 351, 417). A 21st Century representative advised that their records did not indicate Plaintiff was on any formal leave of absence. (Doc. 56-1 at 407). And the office's practice manager could not recall any reason for the reduction in Plaintiff's hours.[3] (Doc. 56-1 at 347). Based on this information, Defendant requested Plaintiff's surgical schedule during the relevant period. (*Id.*)

21st Century provided Defendant an Appointments Productivity Report, which identified the number of appointments Plaintiff conducted each day and the time spent in each. (Doc. 56-1 at 370-82). This report similarly reflected hours below the minimum threshold for active employment. And it wasn't just his time that decreased; other documentation revealed Plaintiff's earnings were also reduced.

---

[3] Nor did this decrease in hours have anything to do with Plaintiff's shoulder surgery. Plaintiff asserted he was not disabled during this period, and ReliaStar confirmed with Dr. Havig that Plaintiff was not restricted in his physical abilities. (Doc. 56-1 at 19).

Because Plaintiff apparently was not actively employed from March 15th to May 23rd, nor on any approved leave of absence, Defendant determined that his coverage ended on March 15th. So when he returned to full-time work on May 25th, this became his new effective date under the Policy. (Doc. 56-1 at 343). This change in his coverage-effective date is critical because it opened the door for Defendant to deny Plaintiff's claim.

The Policy excludes coverage for preexisting conditions. Specifically, it provides that "[b]enefits will not be paid if your disability begins in the first twelve months following the effective date of your coverage and your disability is caused by, contributed by, or the result of a pre-existing condition." (Doc. 57-1 at 18). A "pre-existing condition" is defined as "any condition for which you have done 3 months just prior to your effective date of coverage: [r]eceived medical treatment or consultation[,] [t]aken or were prescribed drugs or medicine[,] or [r]eceived care or services, including diagnostic measures." (Doc. 57-1 at 6).

Because Plaintiff was placed out of work and filed his long-term disability claim within twelve months of his new coverage-effective date of May 24th, Defendant reviewed the three-month "lookback" period for any treatment related to his hand tremors. As discussed, he had consulted Dr. Havig on May 14th for such tremors, which falls within the lookback period. So Defendant concluded the hand tremors were a preexisting condition excluded from

coverage. On October 5, 2021, it sent Plaintiff a letter formally denying his claim for long-term disability benefits. (Doc. 56-1 at 266-71).[4]

Plaintiff appealed.[5] After several phone calls and letters between Plaintiff's counsel and Defendant, Plaintiff sought to clarify his position. In a letter to Defendant, he tried to rebut the assertion that he worked only 9.5 hours for four consecutive pay periods. He explained that, as an essential worker during the COVID pandemic, he was on call twenty-four hours per day, seven days a week. Although not recorded, he claimed to have spent much of his time performing surgery, evaluating patients pre- and post-operatively, reviewing and writing medical records, and engaging in other duties. As for his salary reduction, he clarified this was done intentionally to continue paying his employees (and avoid layoffs) during the COVID pandemic. He concluded by insisting that he worked 35-40 hours per week "in addition to being on call 24/7." (Doc. 56-1 at 152). In his view, there was never a lapse in coverage because he always maintained active-employment status. And having maintained coverage, Defendant could not label his tremors as a preexisting condition.

---

[4] Because Defendant denied the claim based on a preexisting condition, it did not complete its investigation into whether Plaintiff's hand tremors qualified as a covered disability. But it reserved its right to complete this investigation if needed. (Doc. 56-1 at 270).

[5] Although Plaintiff never formally appealed, Defendant's conduct and various correspondences demonstrate it construed Plaintiff's subsequent letters as such.

Informed by Plaintiff's position, Defendant again conferred with 21st Century "to ensure that [it] fully understands this situation." (Doc. 56-1 at 64). It sought confirmation that 21st Century would log all of Plaintiff's work hours. And, if so, it requested any other documentation that would reflect Plaintiff's hours worked. (Doc. 56-1 at 64). In response, 21st Century stated that it "can confirm that hours worked by Dr. Tunkle is recorded by the practice". It provided the same daily logs Defendant used to formulate its initial opinion. (Doc. 56-1 at 62). Defendant then shared this information with Plaintiff and allowed him a chance to respond. Specifically, it advised: "If you have information which refutes this documentation, we ask that you provide it to us within the next 21 days so that we may consider it as part of the appeal review." (Doc. 56-1 at 130).

Rather than provide documentation or other physical evidence to support his position, Plaintiff submitted his own declaration as well as one from his former partner, Dr. Justin D. Warner. In his declaration, Plaintiff stated that the documentation relied upon by Defendant—the productivity report—is "an incomplete record of my work" as it does not include time spent on various other tasks, such as reviewing a patient's medical records before seeing the patient, completing the required documentation after the patient is seen, phone communications with additional care givers, communications with the patient's family, or time spent researching unique cases. He also noted the

report "only estimates the amount of time needed to complete an operation" but fails to reflect that some surgeries go longer than expected. Nor does it account for time spent on surgery preparation, inpatient evaluations, post-operative documentation, communication with hospital staff, travel to various medical offices and hospitals, and post-operative patient visits. (Doc. 56-1 at 32-33). In short, he remained steadfast that he was actively employed, despite what his employer's records may suggest.

He also provided a statement from his former colleague, Dr. Warner, who declared that:

> Between March and May 2020, Dr. Tunkle and I were actively working for 21st Century Oncology, LLC. During this period, Dr. Tunkle was worked [sic] more than 30 hours per week. He and I were splitting call duties during that time, which in and of itself generated at least 30 hours of work per week. This is not reflected in our employer's records. Furthermore, Dr. Tunkle engaged in marketing efforts, business administration, rounding on hospital patients and other work duties that were not documented—all of which is very time consuming. Dr. Tunkle's earnings were reduced during the above period because he voluntarily cut his own salary in order to continue paying employees who otherwise would have lost their jobs due to the pandemic.

(Doc. 56-1 at 47).

Based on these declarations, Defendant went back to 21st Century, requesting any documentation that would support Plaintiff's and Dr. Warner's assertions. (Doc. 56-1 at 62). In response, 21st Century's human resource analyst stated she does "not have any information to support Plaintiff was working full time during the period from 3/15/20 to 5/20/20" and attached the

pay history for reference. She subsequently shared the following message from her office team:

> Beginning in March of 2020 we reduced [Plaintiff's] salary to just cover benefits due to Covid. His assertion below is correct, as he did that so he could continue to cover the practice overhead including staff. He was also having his profit share pulled to the P&L to help cover[.]

(Doc. 56-1 at 60). But given this statement addresses only Plaintiff's salary reduction rather than his hours, it did little to ease Defendant's concerns.

Still unable to conclude Plaintiff was actively employed from March to May 2020, Defendant retained a Certified Public Accountant to conduct a forensic review of Plaintiff's financials to determine his monthly earnings. The review was largely inconclusive with the CPA opining: "It cannot be determined if [Plaintiff's] hours reported 3/15/2020-5/23/2020 in the report are less than normal." (Doc. 56-1 at 57).

Defendant again contacted Plaintiff (through his counsel), providing him an opportunity to respond to the CPA report. And it again advised:

> At this time, we ask that you please provide us with any documentation that supports your client's actual hours worked during the time period of March 12, 2020 and May 24, 2020. While we appreciate the declarations provided by your client and his former partner, given the conflicting information provided by your client's Employer, we do not have sufficient proof to establish that he continued to work the minimum hours required under the policy during that time period.

(Doc. 56-1 at 29). Two weeks later, Plaintiff responded without providing any new information. (Doc. 56-1 at 12-13).

On January 28, 2022, Defendant upheld its denial of Plaintiff's long-term disability claim. It explained that requests for clarification from 21st Century confirmed Plaintiff was not working the minimum hours required under the Policy to be eligible for coverage. And despite attempts to secure documentation from Plaintiff supporting his claim that 21st Century's records are incomplete, he provided only the two declarations which "do not provide any specific records or data to reflect what hours [Plaintiff] worked" during the relevant period. (Doc. 56-1 at 18-21).

A month later, Plaintiff supplied an email from the Vice President of People and Culture-Clinical Operations at 21st Century. She confirmed Plaintiff was "listed as a full-time employee, which is consistent with his employment status within our HRIS prior to his termination." (Doc. 56-1 at 15). Four days after that, Defendant wrote back to Plaintiff advising that the email did not alter its conclusion. (Doc. 56-1 at 8).

## STANDARD OF REVIEW

Pursuant to 29 U.S.C. § 1132(a)(1)(B), an ERISA participant may bring a civil action to recover benefits, enforce rights to benefits, or clarify rights to future benefits due under a benefit plan. Although parties to an ERISA claim typically move for summary judgment under Rule 56, benefit-denial claims are unique because "[t]he Eleventh Circuit charges the district court with determining de novo whether the administrator's decision was wrong rather

than whether there are questions of material fact that require trial and whether the parties are entitled to judgment as a matter of law." *Cottingim v. ReliaStar Life Ins. Co.*, No. 8:22-CV-1235-CEH-CPT, 2024 WL 1156483, at *11 (M.D. Fla. Mar. 18, 2024). So the administrative record may contain unresolved factual issues, but "unless the administrator's decision was wrong, these issues will not preclude summary judgment as they normally would." *Id.* In short, the usual Rule 56 standards do not apply. *See Prelutsky v. Greater Georgia Life Ins. Co.*, 692 F. App'x 969, 972 n.4 (11th Cir. 2017); *see also Cottingim*, 2024 WL 1156483, at *11 ("[T]he summary judgment standard set forth in Fed. R. Civ. P. 56 is incongruent with the ERISA standard of review.").

Instead, the Eleventh Circuit has developed a six-step analysis for benefits-denial claims:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the Court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable

> grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011).

When applying de novo review, the district court "is not limited to the facts available to the Administrator at the time of the determination." *Harris v. Lincoln Nat'l Life Ins. Co.*, 42 F.4th 1292, 1296 (11th Cir. 2022) (citing *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.31 (11th Cir. 1994)). But review under an arbitrary and capricious standard is confined to the administrative record. *Harris*, 42 F.4th at 1296.

Ultimately, the plaintiff suing under ERISA "bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (internal citation omitted). "But, if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Id.*

## ANALYSIS

The contested issue is a narrow one: whether Defendant properly concluded Plaintiff was not "actively employed" from March 15th to May 23rd. If so, Defendant asserts Plaintiff's tremors are a preexisting condition excluded

- 12 -

from coverage. Plaintiff makes no effort to dispute this point. As it must, the Court begins by reviewing the Administrator's decision de novo. But it need not advance any further in the multi-step analysis.[6]

The administrative record leaves little room to second-guess Defendant's conclusion. Indeed, all documentation indicates Plaintiff was not actively employed from March 15th to May 23rd. Perhaps most compelling are the hourly logs that show Plaintiff worked only 9.5 hours each pay period during these two months (despite 72-80 hours recorded the rest of the year). There are also the Appointments Productivity Reports, which further reflect Plaintiff spent far less than thirty hours each week in appointments. And 21st Century confirmed repeatedly that it had no record to support Plaintiff worked full time during this period, and he was not on any approved leave of absence.

Plaintiff offered little of substance to rebut this evidence, despite multiple opportunities to do so. Instead, he provided only his own declaration and one from his colleague, unsubstantiated by any evidence, assuring Defendant that he met the minimum hourly threshold. And he shared a list of job duties that were not reflected in the productivity reports. But even taking these declarations at face value raises more questions than answers.

---

[6] For this reason, the Court does not address whether Defendant was granted discretion in reviewing the claim, which the parties dispute.

Plaintiff insists that, although it was not recorded, he was constantly researching, making telephone calls, traveling to medical facilities, completing medical records, preparing for surgery, or conducting post-operative visits with patients. All of this, he claims, amounted to at least 35-40 hours per week. Plus, he was on call 24/7. If that is all true, surely there would be *something* he could offer in support: call logs, redacted medical records, invoices, mileage receipts, calendar appointment entries, or hospital records (to name a few). Yet despite multiple requests from Defendant to provide documentary support for his actual hours worked, he never did. He submitted only uncorroborated declarations from himself and his former colleague, essentially asking Defendant (and the Court) to simply take their word for it. But that will not suffice.

Although Plaintiff eventually submitted a statement from the Vice President of People and Culture-Clinical Operations at 21st Century, it simply confirmed Plaintiff was "listed" as a full-time employee and that this listing mirrored his status "prior to his termination." But there is no dispute Plaintiff was working full time prior to his termination. Indeed, the record is clear he regained active-employment status as of May 25th. And his classification with human resources as a full-time employee does not by any means reflect his actual hours worked (especially when his logged hours suggest otherwise). So, this statement carries little (if any) weight. *Cf.*

*Griffin v. United of Omaha Life Ins. Co.*, No. 2:12-CV-03841-VEH, 2014 WL 2875415, at *6 (N.D. Ala. June 23, 2014) (the plaintiff was not "actively employed" even though he was "considered" an employee, received full salary and benefits, and was available to work "as needed" because "the administrative record contain[ed] no evidence that [he] worked 30 or more hours each week").

There is a larger question still. Why wasn't it logged if Plaintiff conducted all this additional work as he claims? Afterall, 21st Century explained its business practice is to record all hours worked. And Plaintiff was otherwise able to log 72-80 hours for the other pay periods during that year (while he was still employed). He does little to answer this question or address this clear discrepancy. Though he repeatedly cited COVID as justification for his decrease in salary, this is irrelevant to the number of hours he may or may not have worked.[7] Plus, the COVID pandemic extended well beyond May 23, 2020, yet Plaintiff's recorded hours shot back up after this date. He also highlights that he was a COVID first responder. While admirable, the Court fails to see the relevance of this point, and Plaintiff certainly does not explain it. And his reliance on the CPA analysis does not move the scale given it was largely inconclusive.

---

[7] Plaintiff was a salaried employee. So as best the Court can tell, it is not as if he needed to avoid recording his time to reduce his income.

Plaintiff also maintains 21st Century's productivity reports do not provide a complete illustration because they do not include his work conducted outside of appointments and surgery. Fair enough. Indeed, common sense would dictate that a surgeon's job requires more. But even so, Plaintiff failed to produce anything reflecting the time spent beyond his scheduled appointments. Plus, 21st Century made clear that any additional hours worked would have been recorded, yet he recorded only 9.5 hours each pay period.

Trying another angle, Plaintiff broadly argues it was unreasonable for Defendant to deny his claim due to a lack of documentation "without performing *any* investigation other than receiving payroll and 'productivity records.'" (Doc. 67 at 9) (emphasis original). It is true—although Plaintiff failed to mention it—that ERISA imposes on the plan administrator "the responsibility to fully investigate a claim before denying benefits." *Boysen v. Illinois Tool Works Inc. Separation Pay Plan*, 767 F. App'x 799, 807 (11th Cir. 2019). And "an administrator's decision to deny benefits must be based on a complete administrative record that is the product of a fair claim-evaluation process." *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 676 (11th Cir. 2014).[8]

---

[8] Generally, determining whether the administrator conducted a complete investigation is a predicate to the six-step analysis. *See, e.g.*, *Melech*, 739 F.3d at 673 ("As a matter of common sense, we cannot evaluate [the administrator's] ultimate decision to deny [the insured's] claim without first considering whether the record [the administrator] had before it was complete."). But given Plaintiff raises this point in the de novo analysis of his brief, the

- 16 -

But Plaintiff tries to argue something with nothing. He claims Defendant's investigation was insufficient without addressing what he believes is missing from the record[9] or otherwise indicating what additional investigatory steps Defendant should have undertaken. This will not do. *See Michaels v. Sasser's Glass Works Inc.*, 662 F. Supp. 3d 1223, 1243 (S.D. Fla. 2023) ("The law is well-settled that perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."); *Squires v. Astrue*, No. 8:07-CV-180T-EAJ, 2008 WL 341345, at *2 n.3 (M.D. Fla. Feb. 5, 2008) ("The Court will not address issues that are legally and factually undeveloped, as it is incumbent on Plaintiff (through his designated attorney) to establish his arguments with specificity, not in a conclusory manner.").

To be sure though, Defendant's reliance on documents from 21st Century was reasonable, especially given the absence of any contrary evidence. *See Precopio v. Bankers Life & Cas. Co.*, No. CIV.01-5721 (RBK), 2004 WL 5284512, at *11 (D.N.J. Aug. 10, 2004) (noting it "is perfectly reasonable for an insurer to look to an employer's records for a determination of whether a particular insured was actually employed at the time of a covered incident").

---

Court does the same for consistency.

[9] To the contrary, Plaintiff boasted his motion for partial summary judgment "requires this Court to review *fewer than 50* pages" of the administrative record. (Doc. 67 at 4) (emphasis original).

And apart from relying on these documents, Defendant repeatedly sought supplemental information from 21st Century, allowed Plaintiff multiple opportunities to provide his own evidence, and even retained a CPA to review Plaintiff's finances. It is unclear what more Plaintiff wanted Defendant to do. So, Defendant's investigation was reasonable. *See Boysen*, 767 F. App'x at 811 ("Nothing in ERISA, of course, requires plan administrators to independently scour the countryside in search of evidence to bolster a petitioner's case."); *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir. 2001) (explaining that ERISA requires a "reasonable inquiry" not a "full-blown investigation").

Perhaps Plaintiff did, in fact, work the extra duties and hours, as he claims. But if he did, he failed to validate it sufficiently. So the Court agrees with Defendant's determination that Plaintiff was not actively employed from March 15th to May 23rd. *Cf. Dorsen v. GE Grp. Life Assur. Co.*, No. CIV.A. 1:05-CV-0036G, 2006 WL 898174, at *6 (N.D. Ga. Apr. 5, 2006) ("The court finds that plaintiff did not meet [his] burden, as he failed to provide any evidence to defendant that he was an active, full-time employee at the time of his alleged disability."). Because this is all Plaintiff asks the Court to review in his motion for partial summary judgment, his motion is denied.[10]

---

[10] In his response to Defendant's summary-judgment motion, Plaintiff argues that Defendant "does not present any argument or authority to support what recordkeeping procedures [by

This is not the end of the inquiry. The Court still must decide whether Plaintiff's hand tremors were in fact a preexisting condition, which ultimately formed the basis of Defendant's benefits denial. The Policy excludes disabilities beginning in the first twelve months of the effective date and resulting from a preexisting condition. And a "pre-existing condition" is a condition for which the insured underwent treatment within three months before the effective date of coverage.

Because Plaintiff was not actively employed as of March 23rd, his coverage ceased. When he returned to active-employment status on May 25th, this became his new coverage-effective date. He was ultimately placed out of work for the tremors in July 2020, which is well within one year of the new effective date. And since he sought treatment for his hand tremors on May 14th, which is during the three-month lookback period, Defendant argues the tremors are a preexisting condition which precludes long-term disability coverage. On this basis, it denied Plaintiff's long-term disability claim.

Plaintiff never addressed this issue in his response to Defendant's motion (or in his own motion). So the Court presumes he concedes it. *See, e.g., Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (noting that a

---

21st Century] were 'reasonable as a matter of law' during 'the largest spike in mortality in the U.S. in 100 years' [COVID]." (Doc. 68 at 18). This argument is a red herring, completely misconstrues the Policy's language, and has no basis in law or fact. So it does not warrant further attention.

Case 2:23-cv-00010-SPC-NPM   Document 74   Filed 08/02/24   Page 20 of 20 PageID 4934


litigant "cannot readily complain about the entry of a summary judgment order that did not consider an argument [he] chose not to develop for the district court at the time of the summary judgment motions"); *Abele v. Hernando Cnty.*, No. 8:04-CV-344-T-24 MSS, 2005 WL 8160210, at *2 (M.D. Fla. Apr. 1, 2005), *aff'd*, 161 F. App'x 809 (11th Cir. 2005) ("Plaintiff has not responded to this argument, and as such, the Court presumes that Plaintiff concedes this issue."). Besides, the decision otherwise appears proper.

Even under a de novo review of the administrative record, Defendant's decision cannot be said to be wrong. Accordingly, the Administrator's decision is affirmed, and Defendant is entitled to summary judgment.

Accordingly, it is now **ORDERED:**

1. Plaintiff's Motion for Partial Summary Judgment (Doc. 67) is **DENIED**.

2. Defendant's Motion for Summary Judgment (Doc. 63) is **GRANTED**, and the decision of the Administrator is **AFFRMED**.

3. The Clerk is **DIRECTED** to enter judgment for Defendant and against Plaintiff, terminate any deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on August 2, 2024.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:   All Parties of Record